IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIELLE P.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, | : | |
| Commissioner of Social Security[2] | : | NO.  24-6723 |

**MEMORANDUM AND ORDER**

CAROLINE GOLDNER CINQUANTO, U.S.M.J.                    March 23, 2026

Plaintiff seeks review of the Commissioner's decision denying her applications for

Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI").   For the reasons that follow, I conclude that the decision of the Administrative

Law Judge ("ALJ") is not supported by substantial evidence and recommend that the case

be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on February 10, 2022,

alleging disability since December 10, 2019, as a result of bilateral rotator cuff

impairment with frozen shoulder, fibromyalgia, type 1 diabetes with neuropathy in the

---

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her first name and last initial.  See Standing Order – In re:  Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Frank Bisignano was appointed Commissioner of Social Security on May 6, 2025.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Bisignano should be substituted as the defendant in this case.  No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

bilateral hands and feet, headaches, gastroparesis, depression, and anxiety.[3] Tr. at 63, 110, 123, 255-56, 284.  Her applications were denied initially on July 18, 2022, id. at 172-73 (SSI), 177-78 (DIB), and again upon reconsideration on December 15, 2022.  Id. at 186-87 (DIB), 191-92 (SSI).  On December 22, 2022, Plaintiff requested an administrative hearing.  Id. at 193.  After holding a hearing on October 27, 2023, id. at 57-109, the ALJ issued an unfavorable decision on May 2, 2024.  Id. at 17-41.  The Appeals Council denied Plaintiff's request for review on October 25, 2024, id. at 1-6, making the ALJ's May 2, 2024 decision the final decision of the Commissioner.  20 C.F.R. §§ 404.981; 416.1481.  Plaintiff sought review in federal court on December 18, 2024, Doc. 1, and the matter is now fully briefed.  Docs. 9, 13, 14.[4]  The case was originally assigned to my colleague, the Honorable Carol Sandra Moore Wells, and was reassigned to me.  Doc. 10.[5]

## II.    LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

---

[3]To be entitled to DIB, Plaintiff must establish that she became disabled on or before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  Here, the ALJ found and the Certified Earnings Record establishes that Plaintiff's DLI is December 31, 2027.  Tr. at 18, 257.

[4]Pinpoint citations to the briefs in the case are to the court's ECF pagination.

[5]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 12.

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1.    Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.    If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3.    If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

3

4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

5.    If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.    DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claims

In her May 2, 2024 decision, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since December 10, 2019, her alleged onset date. Tr. at 19. At step two, the ALJ found that Plaintiff had the following severe medically determinable impairments of "rotator cuff impingement, right; lateral epicondylitis, left; trochanter bursitis; gastroparesis; fibromyalgia; morbid obesity; and type 1 diabetes mellitus." Id. at 20. At the third step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments…." Id. at 22. The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform

4

> sedentary work . . . except she can occasionally push and/or pull. She can occasionally climb ramps and stairs, balance, stoop, and kneel. She can never climb ladders, ropes, or scaffolds; crawl; or crouch. [Plaintiff] must avoid all exposure to hazardous machinery and unprotected heights. She must avoid concentrated exposure to non-weather-related extreme cold, humidity, and vibration. [Plaintiff] can never reach overhead with the right upper extremity. She can frequently, but not constantly, reach in all other directions, handle, finger, and feel with the bilateral upper extremities. The work environment should provide ready access to a restroom. She must avoid more than moderate noise, as defined in the *Selected Characteristics of Occupations*. [Plaintiff] must be able to alternate positions between sitting and standing and walking once or twice per hour for five minutes at the workstation.

Tr. at 25.

At the fourth step, the ALJ found that Plaintiff was unable to perform any past relevant work. Id. at 34. Based on the Plaintiff's age, education, work experience, and RFC, a vocational expert ("VE") testified that Plaintiff could perform the jobs of lens inserter, table worker, and food and beverage clerk. Id. at 35. As a result, the ALJ concluded that Plaintiff was not disabled. Id. at 36.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly consider the opinion evidence in crafting the RFC assessment and failed to resolve inconsistences between the hypothetical she posed to the VE and the jobs identified by the VE based on the descriptions of those jobs in the Dictionary of Occupational Titles ("DOT"). Doc. 9. Defendant responds that the ALJ properly considered all medical opinions and incorporated all of Plaintiff's credibly established limitations in the RFC and in hypothetical questions to the VE. Doc. 13. In

addition, Defendant argues that there is no inconsistency between the hypothetical posed to the VE and the jobs identified by the VE..  Plaintiff has filed a Reply.  Doc. 14.

### B.    Plaintiff's Claimed Limitations and Testimony at the Hearing

At the administrative hearing, Plaintiff testified essentially as follows.  Plaintiff was 37 years old at the time of the hearing.  Tr. at 64.  She lived with her two children, who were 7 and 18 at the time, as well as with a pet dog.  Id. at 64-65.  She completed the 12th grade.  Id. at 66-67.  Plaintiff has past relevant work as a hair stylist, wig seller, and sales clerk at a cellphone store.[6]  Id. at 68-70, 88.  Before Christmas in 2018,[7] Plaintiff was hit by a bicyclist, thrown into the street, and landed on her right side, injuring her shoulder.  Id. at 79.  In addition, Plaintiff developed similar symptoms in her left shoulder, and suffers from headaches with sensitivity to noise and light, diabetic neuropathy, gastroparesis, and fibromyalgia, "which makes all of the other ailments . . . worse."  Id. at 82.

She can walk, sit, or stand for about 20 minutes before needing to change position.  Tr. at 73.  However, when loading the dishwasher, she needs to take a break after 10-15 minutes.  Id.  She can lift a gallon of milk but struggles with it.  Id. at 74.  As a result of

---

[6]Plaintiff explained that she worked out of her home as a hairdresser from 2019 through October of 2022, reducing her workload due to the impairments in her shoulders.  Tr. at 65-66, 70.  She also sold wigs out of her home that a friend bought overseas.  Id. at 88-89.

[7]Although Plaintiff testified that the accident took place in late 2019, the medical record establishes that the accident took place in December of 2018.  See tr. at 450 (Jul. 2, 2019 – complaints of shoulder pain with notation regarding the accident occurring in 2018).

the injuries she sustained after being hit by the bicyclist, Plaintiff cannot lift her arms above shoulder level, and has difficulty reaching behind her which causes difficulties using the bathroom.  Id. at 79-80.  Repetitive motion with her hands/arms aggravates her pain, causing "throbbing and stabbing pain," requiring "little breaks."  Id. at 80.

The pain in her shoulders interrupts her sleep and affects her concentration.  Tr. at 80-81.  She can bathe and dress herself but requires assistance to wash her hair.  Id. at 74. She can cook and clean the house but requires breaks.  Id.  She is active on social media an hour a day and sits with her son when he plays video games and "might . . . play with him a little bit."  Id. at 75.

On an average day, she gets up, gets her son ready for school and makes him breakfast, and takes him to school with her older son or a friend.  Tr. at 75.  She will do house chores, pacing herself, or goes to doctors' appointments.  Id.  She will go outside with the dog and will help her son do homework when he gets home from school.  Id. Then, she will prepare dinner and get ready for bed.  Id.

Plaintiff explained that she has not had surgery on her shoulders because the doctor advised her that she "could get worse from actually getting the surgery."  Tr. at 76. The doctor explained that she was slow to heal due to the diabetes and "the frozen shoulder might not heal."[8]  Id. at 78.  The steroid injections did not help and raised her

---

[8]Frozen shoulder, the common name for adhesive capsulitis, causes pain and stiffness in the shoulder.  Over time, the shoulder becomes very hard to move.  See https://orthoinfo.aaos.org/en/diseases--conditions/frozen-shoulder/ (last visited Feb. 21, 2026)

blood sugar, and trigger point injections "didn't help at all." Id. at 76. At the time of the hearing, Plaintiff was taking gabapentin, cyclobenzaprine, mirtazapine, naproxen, and had just begun taking meloxicam,[9] but found that "nothing is really helpful." Id. at 77. Plaintiff has also participated in physical therapy, but did not express any opinion on its effectiveness. Id. at 76-77, 85-86.

A VE also testified at the hearing. Tr. at 86-107. The VE testified essentially as follows. The VE classified Plaintiff's prior work as a sales clerk as an unskilled, light exertional job. Id. at 87-88. The hair stylist position was a skilled, light exertional job. Id. at 88. The job of selling wigs was a semi-skilled, light exertional job. Id. The hypothetical the ALJ posed to the VE differs slightly from that in the ALJ's decision. Compare id. at 91 (hypothetical – "The individual would need to avoid all exposure to industrial machinery with moving, mechanical parts . . . .") (emphasis added), with id. at 25 (decision – "[Plaintiff] must avoid all exposure to hazardous machinery . . . .") (emphasis added). Based on the hypothetical posed by the ALJ at the hearing, the VE testified that such an individual could not perform any of Plaintiff's past relevant work. Tr. at 94-95. However, such an individual could perform the jobs of lens inserter, table

_____

[9]Gabapentin is an anticonvulsant used to treat partial seizures, nerve pain from shingles and restless leg syndrome. See https://www.drugs.com/gabapentin.html. Cyclobenzaprine is a muscle relaxant used for muscle spasms and for fibromyalgia. See https://www.drugs.com/cyclobenzaprine.html. Mirtazapine is an antidepressant. See https://www.drugs.com/mirtazapine.html. Naproxen is a nonsteroidal anti-inflammatory drug ("NSAID") that is used to treat pain or inflammation. See https://www.drugs.com/naproxen.html. Meloxicam is also an NSAID used to treat pain, tenderness, swelling, and stiffness. See https://www.drugs.com/meloxicam.html (last visited Feb. 17, 2026).

worker, and order clerk of food and beverage.  Id. at 94-96.  The normal tolerance for

time off task would be 14% of the time and the normal tolerance for absences would be

one day a month.  Id. at 97.[10]

### C.    Medical Evidence Summary

#### 1.    Treatment Providers

Plaintiff's first reports of pain and reduced range of motion in her right shoulder

predate her alleged onset date of December 10, 2019.[11]  Tr. at 450.  On July 2, 2019,

Plaintiff presented to her primary care provider, Judy Sara Chertok, M.D., reporting pain

and reduced range of motion in her right shoulder following a bicycle accident in

December 2018.  Id.  The following month, an ultrasound of Plaintiff's right shoulder

revealed a "[m]oderate supraspinatus tendon partial-thickness undersurface tear with

calcium deposition [with] no muscle atrophy[,] [m]oderate subscapularis tendinopathy

with calcium deposition[, and p]ain with impingement dynamic maneuvers and trace

subacromial/subdeltoid bursal fluid."  Id. at 495-96 (August 6, 2019 – Procedure Note).

---

[10]There was a discussion between the ALJ and the VE regarding the availability of positions at the light exertional level if the hypothetical person was limited to occasional manipulation.  Tr. at 97-105.  Plaintiff argues, in a footnote, that the ALJ's questioning of the VE was improper, such that, if I were to remand this matter, I should instruct the ALJ that "it is improper for her to assume the role of the vocational witness in order to arrive at a step-five outcome she likes."  Doc. 9 at 6, n. 5.  Because the ALJ's RFC assessment was for sedentary work, I find the discussion about the availability of jobs at the light exertional level is irrelevant.

[11]Because Plaintiff's claims relate to the consideration of evidence related to her shoulder problems, in this section, I will confine my discussion to the relevant evidence in the record.

On August 24, 2020, Plaintiff returned to Dr. Chertok for a follow up visit regarding her diabetes and her joint pain.  Tr. at 442-44.  Plaintiff complained of continued shoulder pain and displayed a limited range of motion in her shoulder.  Id.  Dr. Chertok noted that an ultrasound had confirmed a partial tear of Plaintiff's rotator cuff and referred Plaintiff to orthopedics and to physical therapy.[12]  Id.

On September 25, 2020, Plaintiff had an initial orthopedic visit with Ashley Marie Morgan, PA-C, ("PA Morgan").  Tr. at 438.  Plaintiff had been taking ibuprofen for pain, but she had not yet had physical therapy.  Id. at 439.  PA Morgan examined Plaintiff's right shoulder and arm and made the following findings.  Plaintiff exhibited mild tenderness to palpation at the acromioclavicular joint as well as tenderness over the long head of the biceps at the greater tuberosity.  Id. at 440.  Plaintiff's range of motion was limited and she had positive impingement signs of the rotator cuff.  Id.  PA Morgan obtained and reviewed x-rays of the right shoulder, which showed "calcification . . . consistent with calcific tendinitis."  Id. at 441.  PA Morgan explained that her symptoms "are likely more from the calcific tendinitis than the partial thickness [rotator cuff] tear."  Id.  Due to risks associated with Plaintiff's diabetes, PA Morgan did not recommend immediately starting steroid injections, but rather recommended starting 500-mg naproxen and attempting physical therapy.  Id.  If Plaintiff had too much pain to start

---

[12]In some notes, Dr. Chertok does not identify which shoulder is at issue or conflates the left and right shoulders.  See, e.g., tr. at 442-44, 409.  Later notes identify this issue and correct it.  Id. at 441 (September 23, 2020 – Note to Dr. Chertok stating that physical therapy order identifies left shoulder, when it should identify the right shoulder.)

physical therapy, PA Morgan recommended an ultrasound-guided lavage and injection.[13]

Id.

On November 16, 2020, Saeed Dianat, M.D., performed ultrasound-guided lavage and corticosteroid injection ("CSI") in the right subacromial-subdeltoid bursa.  Tr. at 481-84.  Imaging showed progression of calcific tendinopathy with a "prominent calcific deposit . . . measuring approximately 8x6 mm, increased from the prior examination of 8/6/19" in the supraspinatus, and "[a] small calcific deposit . . .  within the infraspinatus measuring 4x3 mm in size, new from the prior exam."[14]  Id. at 479.  During the procedure, "a small amount of calcifications" was removed, with "some residual calcification left after the procedure."  Id. at 484.

However, during a telehealth visit with Dr. Chertok on March 8, 2021, Plaintiff complained that the lavage and CSI had not provided any lasting relief, that home physical therapy had not helped, and that she was having increased radiating pain down her arm.  Tr. at 433.  The following month, Plaintiff presented to orthopedist Christine Piper, M.D., for follow up.  Id. at 430-32.  She reported "that she got max 2 weeks pain

---

[13]"Ultrasound-guided lavage . . .  is a minimally invasive percutaneous treatment for rotator cuff calcification tendinopathy . . . .  It involves the use of a syringe containing saline and/or anesthetic solution injected directly into the calcification allowing aspiration of the fragmented calcific material."  See https://pmc.ncbi.nlm.nih.gov/articles/PMC11729717/ (last visited Feb. 24, 2026).

[14]Calcific tendinopathy (also known as calcific tendinitis) "is the build-up of calcium deposits within the tendons of the rotator cuff. These calcium deposits contribute to inflammation and may cause mechanical impingement (rubbing) on the acromion (the bony roof of the shoulder)."  See https://orthoinfo.aaos.org/en/diseases--conditions/calcific-tendinitis-of-the-shoulder/ (last visited Feb. 22, 2026).

relief" from the lavage and CSI.  Id. at 431.  She was now experiencing right-sided neck pain and occasional paresthesias/hyperalgesia in the dorsum of her right hand.  Id. Physical examination revealed that Plaintiff was very tender to palpation globally about the shoulder and exhibited capsular irritability with external rotation.  Id. at 432.  Dr. Piper diagnosed Plaintiff with adhesive capsulitis of the right shoulder, and performed a glenohumeral joint CSI, and ordered an MRI.  Id.  The MRI showed "calcific tendinopathy with suspected early extension into the overlying subacromial-subdeltoid bursa[, m]ild surrounding reactive edema-like changes in the supraspinatus and infraspinatus fibers[, s]mall subacromial-subdeltoid bursal effusion[, and m]ild osteoarthrosis of the acromioclavicular joint."  Id. at 474.

Plaintiff returned to the orthopedist and was examined by Adnan N. Cheema, M.D., on May 4, 2021.  Tr. at 427.  Plaintiff reported to Dr. Cheema that the CSI injection given at her last appointment had provided very minimal relief.  Id.  Dr. Cheema noted that Plaintiff had only tried one week of physical therapy thus far.  Id.  Dr. Cheema recommended capsular release and calcific tendinitis removal with rotator cuff repair, that Plaintiff work Dr. Chertok and endocrinology to improve her A1c, and that she continue her existing pain medication regimen of gabapentin and naproxen.  Id. at 427-28.  Plaintiff was scheduled for surgery in May 2021, but that surgery was cancelled due to family issues and never rescheduled.  Id. at 420 (Nov. 30, 2021 – Progress Notes.)

Plaintiff returned to orthopedics for follow up several months later, on November 30, 2021.  Tr. at 420-22.  Plaintiff complained that her shoulder was worsening, with increased stiffness.  Id. Physical examination revealed that Plaintiff's entire right

12

shoulder was tender to palpitation and showed capsular irritability with external rotation. Id.  G. Russell Huffman, M.D., provided a CSI into the right intra-articular space, prescribed methocarbamol and lidocaine patches, and recommended she follow up with one of his partners.[15]  Id. at 422.

On January 26, 2022, Plaintiff returned to orthopedics and saw David Glaser, M.D., one of Dr. Huffman's partners.  Tr. at 391.  She reported that she had lost function in her right upper extremity; that daily activities including reaching, lifting, pulling, and grasping were painful; that she could not reach above her head or out to the side; and that aggressive anti-inflammatories had not helped.  Id.  On physical examination, she was "severely limited."  Id. at 392.  Dr. Glaser recommended that she "aggressively stretch" the shoulder at home.  Id.  If the stretches did not help, he recommended arthroscopic surgery, though the details of the procedure would depend on pre-operative images and intraoperative findings.  Id.  Dr. Glaser ordered x-rays, which revealed "calcification in soft tissues of the supraspinatus outlet in keeping with calcific tendinitis."  Id. at 468-69.

On March 1, 2022, Plaintiff consulted with Warren A. Southerland, M.D., at Penn Pain Medicine ("Penn Pain"), regarding the adhesive capsulitis of her right shoulder.  Tr. at 412-13.  Plaintiff described the pain as feeling "like someone is chainsawing my arm off" and reported that injections had not given her any relief.  Id.  Her existing pain medication regimen consisted of 800-mg ibuprofen three times a day, 500-mg naproxen

---

[15]Methocarbamol is a muscle relaxer. See https://www.drugs.com/methocarbamol.html.  A lidocaine patch is a topical anesthetic used to treat pain.  See https://www.drugs.com/cdi/lidocaine-patch.html (last visited Feb. 20, 2026).

twice a day, 800-mg gabapentin twice a day, 500-mg methocarbamol three times a day as needed, and lidocaine ointment.  Id. at 412.  She was also prescribed 1-mg clonazepam twice daily as needed.[16]  Id.  Dr. Southerland recommended that Plaintiff discontinue ibuprofen, naproxen, lidocaine ointment, and methocarbamol.  Id. at 413.  Dr. Southerland increased Plaintiff's gabapentin to three times a day, and added 2 mg of tizanidine three times a day, and diclofenac gel.[17]  Id.  Dr. Southerland also discussed trigger point injections and recommended that Plaintiff start physical therapy and remain as active as possible.  Id.

On March 30, 2022, Plaintiff returned to Penn Pain and met with Sharmil Gohil, M.D., and Danny Hernandez, M.D.  Tr. at 405-07.  Plaintiff had stopped taking tizandine due to soreness and had not been able to start physical therapy due to a lack of available appointments at her location.  Id. at 405-06.  Plaintiff was given four trigger point injections, into her right levator scapulae and trapezius muscle groups.  Id. at 406.  Drs. Gohil and Hernandez recommended that Plaintiff start Baclofen and provided a list of additional physical therapy locations.[18]  Id.

---

[16]Clonazepam is a benzodiazepine used to treat panic disorder.  See https://www.drugs.com/clonazepam.html (last visited Feb. 20, 2026).

[17]Tizanidine is a short-acting muscle relaxer.  See https://www.drugs.com/tizanidine.html.  Diclofenac gel is an NSAID used to treat mild to moderate pain.  See https://www.drugs.com/diclofenac.html (last visited Feb. 20, 2026).

[18]Baclofen is a skeletal muscle relaxant used to treat certain types of muscle stiffness and tightness and muscle pain.  See https://www.drugs.com/baclofen.html (last visited Feb. 25, 2026).

14

On April 18, 2023, Plaintiff presented to Michael Maloney, M.D., at the Penn Musculoskeletal Center for a consult regarding pain in her <u>left</u> shoulder, which Plaintiff feared was from overuse. <u>Tr.</u> at 604. Plaintiff reported that the pain began six months earlier, and that it reminded her of the early stages of the pain in her right shoulder. <u>Id.</u> Overhead motions worsened the pain. <u>Id.</u> Plaintiff reported that cyclobenzaprine made her sleepy and that gabapentin only helped lessen the tingling in her feet. <u>Id.</u> On examination, Plaintiff had no tenderness to palpitation on either shoulder, though she did have tenderness along her entire left arm. <u>Id.</u> at 608. Plaintiff had limited range of motion in both shoulders, with her left shoulder significantly more limited than her right shoulder. <u>Id.</u> X-rays of Plaintiff's left shoulder showed no radiographic abnormalities. <u>Id.</u> Dr. Maloney noted Plaintiff's documented history of fibromyalgia, pain in other parts of her body, and stated that Plaintiff was "not a great CSI candidate" due to her uncontrolled type 1 diabetes. <u>Id.</u> at 609. Plaintiff was working to get an insulin pump, which could help control her diabetes and give her additional treatment options. <u>Id.</u> The doctor stated that it appeared that Plaintiff's left shoulder was clinically frozen. <u>Id.</u> Dr. Maloney found that Plaintiff had chronic left shoulder pain, adhesive capsulitis of the left shoulder associated with her diabetes, myofascial pain dysfunction syndrome, and left lateral epicondylitis. <u>Id.</u> at 610. Plaintiff voiced to him that she felt defeated and that she had wasted her time visiting him. <u>Id.</u> at 609. Dr. Maloney recommended she try cognitive behavioral therapy to help her mentally cope with pain. <u>Id.</u> The doctor also recommended that she try physical therapy. <u>Id.</u>

15

On September 13, 2023, Plaintiff had an initial physical therapy evaluation with Stephanie DiFuria, PT ("PT DiFuria"), to address her shoulder pain. Tr. at 697. Plaintiff reported to PT DiFuria that she had "trialed" physical therapy about a year prior, without much improvement. [19] Id. Plaintiff also reported that cleaning the house and preparing dinner triggered her shoulder pain. Id. PT DiFuria noted diagnoses of right shoulder adhesive capsulitis, overactive upper trapezii, and poor postural endurance. Id. at 702. On examination, PT DiFuria found that Plaintiff had significant pain and range of motion limitations, though she was unsure if the range of motion limitations were due to guarding or due to capsular restrictions. Id. Plaintiff's strength was also limited by pain. Id. PT DiFuria recommended that Plaintiff attend physical therapy one to two days per week for twelve weeks, as well as complete a home exercise program. Id. at 703.

Plaintiff then began a course of physical therapy. On October 4, 2023, she reported that pressure changes and the recent death of her grandmother caused her to struggle to get out of bed and that she had not been keeping up with her home exercises. Tr. at 692. Plaintiff reported significantly increased pain. Id. at 695. PT DiFuria noted that Plaintiff had not had ultrasounds and diagnostic tests on her left shoulder, but that her diagnosis of frozen left shoulder was based on "limitations and similarities." Id. at 692-93. The following week, PT DiFuria noted that Plaintiff exhibited significant limitations

---

[19]As the ALJ notes, there are no earlier physical therapy notes in the record, though Dr. Huffman did note in 2021 that Plaintiff had trialed physical therapy for a week. Tr. at 30, citing id. at 427.

16

with her right shoulder, with significant tenderness and limitations to her range of motion, which was 90 degrees with significant pain. Id. at 673.

On October 18, 2023, Plaintiff had new physical therapy orders to address hip pain, as Plaintiff reported having trouble walking. Tr. at 679. Plaintiff also reported feeling sore all over, because she had scrubbed her house for an inspection. Id. PT DiFuria instructed Plaintiff in repeated flexion in sitting with great improvements in her clinical baseline neural tension testing and improvement in right lower extremity strength. Id. at 684. PT DiFuria also noted that significant guarding and pain were limiting her ability to obtain objective measurements. Id. On November 1, 2023, her fourth PT visit, Plaintiff reported that she was in a lot of pain, because she had walked her son around for trick or treating the night before. Id. at 674. She had slept on the couch because she was in too much pain to climb the stairs. Id. PT DiFuria noted continued pain relief in Plaintiff's right hip and low back with repeated flexion in sitting. Id. at 677.

The record contains multiple opinions from Dr. Chertok, Plaintiff's primary care physician, who opined essentially as follows. On January 18, 2023, Dr. Chertok opined that Plaintiff is nursing facility clinically eligible due to chronic pain, depression, and type 1 diabetes. Tr. at 598. On July 17, 2023, Dr. Chertok opined, in a short letter, that Plaintiff was permanently disabled and unable to work in any capacity, due to severe depression, post-traumatic stress disorder ("PTSD"), chronic pain/fibromyalgia, bilateral rotator cuff tears, and type 1 diabetes. Id. at 619. On September 29, 2023, Dr. Chertok opined that Plaintiff was unable to perform her tasks of daily living, such as preparing

17

food and shopping, and was "long past" the capabilities required for employment.  Id. at 621.  Despite evaluation and treatment from multiple specialists, her conditions were chronic and progressive.  Id.  Her conditions included type 1 diabetes with multiple complications; multiple musculoskeletal limitations related to a rotator cuff tear, bilateral frozen shoulder, and fibromyalgia; and depression and PTSD.  Id.  Plaintiff was able to perform less than sedentary work.  Id. at 622.  She could stand and walk for less than two hours and sit for less than four hours in a normal workday.  Id.  Plaintiff needed to alternate positions every hour and be able to shift positions at will.  Id.  She could never crouch or climb ladders, but she could occasionally twist, stoop, and climb stairs.  Id. at 623.   Plaintiff's impairments affected her ability to reach, including overhead; to finger; to push and to pull; to handle; and to feel.  Id.  She needed to avoid concentrated exposure to soldering fluxes, solvents, cleaners, and chemicals; even moderate exposure to high humidity; and all exposure to extreme cold and extreme heat.  Id.  Plaintiff was likely to miss more than four days of work per month.  Id.

On October 25, 2023, Dr. Chertok offered an updated opinion letter stating that Plaintiff was newly diagnosed with hip arthritis, gluteus medius tendinosis, great trochanter bursitis and lumbar radiculopathy.  Id. at 673.  While Plaintiff might experience a slight benefit from physical therapy, Dr. Chertok expected that these conditions would contribute to Plaintiff's disability.  Id.

   2.  Consultative Examiners and State Agency Physicians

On June 14, 2022, Plaintiff was examined by consultative nurse practitioner Abby Neely ("NP Neely").  Tr. at 565.  NP Neely reported the following findings.  Plaintiff's

18

gait was normal, except for a slight lean to the right from favoring the right shoulder; her squat was full; she got on and off the exam table without difficulty; and she could rise from a chair without difficulty. Id. at 567. Plaintiff was tender to palpation on the right shoulder and the right side of her neck. Id. at 568. Plaintiff's strength was full in her legs and in her upper left side, but was 2/5 in her upper right side. Id. NP Neely assessed the fine motor activity of Plaintiff's hands and found as follows. Plaintiff's hand and finger dexterity were intact. Id. Her grip strength was full on the left and 40 percent on the right. Id. Plaintiff was able to write her name, though she reported that she often asked her child to write for her. Id. It was unclear how much Plaintiff could do with her hands, but she could use a cup and pen, though she "may struggle with it and be a bit slow." Id. Plaintiff was able to zip, button, and tie. Id.

Based on her examination of Plaintiff, NP Neely opined essentially as follows. Plaintiff had a frozen right shoulder, right shoulder pain, bursitis of the right shoulder, type 1 diabetes, peripheral neuropathy of the hands and feet, fibromyalgia, gastroparesis, and hypothyroidism. Tr. at 569. She could perform less than the full range of light work. Id. at 570. In an eight-hour workday, Plaintiff could sit for six hours and stand and walk for three hours each in two-hour increments. Id. at 571. Plaintiff could never reach overhead with her right hand, but she could occasionally reach in all other directions, handle, finger, feel, push, and/or pull with the right upper extremity. Id. at 572. She had no limitations in the use of her left hand. Id. Plaintiff could frequently operate foot controls bilaterally. Id. Plaintiff could frequently climb stairs and ramps, balance, stoop, and kneel. Id. at 573. Plaintiff could never climb ladders or scaffolds, crouch, or crawl.

19

Id.  Plaintiff could tolerate frequent exposure to humidity and wetness; dust, odors, fumes, and pulmonary irritants; extreme cold; and extreme heat.  Id. at 574.  Plaintiff could tolerate occasional exposure to unprotected heights, moving mechanical parts, vibrations, and moderate noise.  Id.  Plaintiff could never operate a motor vehicle.  Id.  Plaintiff could shop, travel independently, ambulate with use of certain aids, walk a block at a reasonable pace, use public transit, climb a few steps with use of a single hand rail, prepare a simple meal and feed herself, care for her personal hygiene, and use paper.  Id. at 575.

On June 27, 2022, at the initial consideration stage, State Agency consultant Karel Ann Keiter, D.O., completed her review of Plaintiff's records.  Tr. at 120, 130.  Dr. Keiter opined essentially as follows.  Plaintiff could perform less than the full range of light work.  Id.  In an eight-hour workday, Plaintiff could sit for six hours and stand and/or walk for a total of six hours.  Id.  She could never crawl or climb ladders, ropes, or scaffolds, but she could occasionally crouch.  Id. at 118, 131.  With respect to upper extremity limitations, Dr. Keiter found Plaintiff could never reach overhead with her right arm, but could occasionally reach in front and laterally and handle with the right upper extremity.  Id.  She could frequently finger.  Id.  Plaintiff must avoid concentrated exposure to extreme cold, noise, vibration, and hazards such as machinery and heights.  Id. at 119, 132.

On December 15, 2022, at the reconsideration level, State Agency consultant Wadicar Fabian Nugent, M.D., completed his review of Plaintiff's records.  Tr. at 146, 159.  Dr. Nugent opined essentially as follows.  Like Dr. Keiter, Dr. Nugent found that

20

Plaintiff could perform less than the full range of light work and that she could sit for six hours and stand and/or walk for six hours in an eight-hour workday.  Id. at 142, 155.  She could never climb ladders, ropes, or scaffolds, but she could occasionally crawl.  Id. at 143, 156.  She could frequently climb ramps and stairs, balance, stoop, kneel, and crouch. Id.  Plaintiff could never reach overhead with her right upper extremity.  Id.  She could occasionally reach in front and laterally with her right upper extremity.  Id.  Plaintiff could frequently handle with the right upper extremity and had no limits to fingering.  Id. Plaintiff must avoid concentrated exposure to extreme cold, humidity, noise, vibration, and hazards such as machinery and heights.  Id. at 144, 157.

**D.**      **Plaintiff's Claims**

1.      Opinion Evidence

Plaintiff argues that the ALJ erroneously rejected the opinion of two state agency reviewing physicians and a consultative examiner, which limited Plaintiff to only occasional use of her right upper extremity.  These opinions, if credited, would have required the ALJ to find that Plaintiff was precluded from all work.  Doc. 9 at 3-10. Defendant responds that substantial evidence supports the ALJ's RFC determination, including the ALJ's consideration of the opinion evidence.  Doc. 12 at 4-14.

The ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or
> prior administrative medical finding(s), including those from
> your medical sources.

20 C.F.R. §§ 404.1520c(a); 416.920c(a). The regulations list the factors to be utilized in considering medical opinions: supportability, consistency, treatment relationship (including the length and purpose of the treatment and frequency of examinations), specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program. Id. §§ 404.1520c(c); 416.920c(c). The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others. Id. §§ 404.1520c(b)(2); 416.920c(b)(2). The regulations explain that supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." Id. §§ 404.1520c(c)(1); 416.920c(c)(1). In addition, consistency means "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be." Id. §§ 404.1520c(c)(2); 416.920c(c)(2).

The Third Circuit has held that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)). When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or the wrong reason." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

22

Here, I focus on the ALJ's finding that Plaintiff "can never reach overhead with the right upper extremity[, but s]he can frequently, but not constantly, reach in all other directions . . . with the bilateral upper extremities." Tr. at 25. The conclusion that Plaintiff can frequently reach in all other directions is contrary to every assessment in the record. Consultative examiner NP Neely opined that Plaintiff could never reach overhead with her right hand and could only occasionally reach in all other directions with her right hand. Id. at 571. In fact, in her Range of Motion Chart, NP Neely indicated that Plaintiff's right shoulder movements were significantly limited in all aspects: forward elevation and abduction of the right shoulder was 40° out of 150°; adduction was 5° out of 30°; internal rotation was 5° out of 40°; and external rotation was 15° out of 90°. Id. at 579. Dr. Keiter similarly found at the initial review stage that Plaintiff "should be limited to occasionally push and/or pull with [right upper extremity]," id. at 130, and that Plaintiff can "[o]ccasionally reach right in front and laterally, occasionally handle with right upper extremity." Id. at 131 (emphasis added). Dr. Nugent offered the same limitations.[20] Id. at 142-43.

Moreover, in addition to NP Neely's Range of Motion Chart, the limitations in Plaintiff's right shoulder are evidenced throughout the record. See id. at 450 (7/2/19 – Dr. Chertok – "Right shoulder with diffuse [tenderness to palpation]. Unable to abduct

---

[20]Dr. Chertok provided a Medical Opinion Worksheet addressing manipulative limitations, but the form did not break out reaching overhead from other reaching and the doctor merely indicated that Plaintiff's "Reaching (including overhead)" ability was affected by her impairments. Tr. at 623.

past 80 degrees or forward extend past 70 degrees."); 440 (9/2/5/20 – PA Morgan – tenderness to palpation of right shoulder and limited range of motion of right shoulder – forward flexion 80° out of 180°, unable to perform internal rotation), 428 (5/4/21 – Dr. Cheema – tenderness to palpation globally about the shoulder, exam limited by pain); 421-22 (11/30/21 – Dr. Huffman – same), 392 (1/26/22 – Dr. Glaser – "On examination she is severely limited.  Her passive external rotation is only to about 20 degrees."), 414 (3/1/22 – Dr. Southerland – "right [upper extremity] function is limited by pain"), 700 (9/13/23 – PT DiFuria – chart evidencing limited range of motion).  In addition, Plaintiff has diagnoses of a partial tear in her right rotator cuff and calcific tendinitis.  Id. at 441 (9/25/20 – calcific tendinitis), 495 (8/6/19 – partial tear in right rotator cuff). Moreover, the objective medical evidence establishes a partial tear in Plaintiff's right supraspinatus tendon and calcific deposits in the supraspinatus and infraspinatus tendons.  Id. at 479 (11/16/20 – ultrasound), 468 (1/26/23 – right shoulder x-ray).

Despite this overwhelming evidence, the ALJ found the opinions of NP Neely and Drs. Keiter and Nugent "partially persuasive."  Tr. at 33.  The ALJ explained that she considered NP Neely's examination was "internally inconsistent with occasional[] manipulative activites on the right."  Id.  Specifically, the ALJ noted that Plaintiff was able to write her name, use a cup and a pen, zip, button, and tie."  Id.  However, none of these identified activities requires Plaintiff to use her shoulder to reach.  In addition, with respect to Plaintiff's use of her right arm, the ALJ explained, "I have not limited her further with regard to her right upper extremity as her daily activities of house cleaning, cooking, playing video games, and engaging on social media are consistent with the

24

frequent but not constant use of her bilateral extremities." Id. at 33.  Reviewing Plaintiff's testimony, the ALJ's reasoning does not stand up to the medical evidence. Plaintiff explained that she does housework, but has to take breaks.  Id. at 74.  As for playing video games, Plaintiff said she sits with her youngest son when he is playing and might "play with him a little bit."  Id. at 75.  Engaging in social media may require fine manipulation, but does not require reaching.

This case is similar to Kenyon v. Saul, wherein the ALJ "rejected every medical opinion [and] crafted [the RFC] assessment . . . based largely upon her own lay evaluation of the medical evidence, in a manner that contradicted every treating source opinion," relying instead upon counseling records, psychiatric treatment notes, and the claimant's activities of daily living.  2021 WL 2015067, at *3 (M.D. Pa. May 19, 2021). The Honorable Martin Carlson remanded the case.

> This case presents a striking circumstance.  In fashioning an RFC for the plaintiff and denying this disability claim, the ALJ has essentially rejected every medical opinion. Instead, relying upon her subjective evaluation of [the plaintiff's] treatment records, the ALJ crafted an RFC that is unhinged to any medical opinion and contradicts all of the medical opinions in the administrative record.  The ALJ has also rejected a treating source consensus from three different medical sources who had cared for [the plaintiff] over a span of years and had found [the plaintiff's] emotional impairments to be disabling.  In our view, the ALJ's justification for this course of action – which consisted of a critique of every medical opinion coupled with a single sentence that this RFC was supported by the claimant's counseling records and associated examinations . . . , psychiatric treatment notes  . . . , and the claimant's activities of daily living – is insufficient to justify discounting all of the medical opinions in this case.  Therefore, we will remand for

a more fulsome consideration of this medical opinion
evidence.

Id. at *8 (internal quotations from the record omitted).

Judge Carlson explained that the unanimity of the medical opinions in the record

spoke volumes when viewed through the supportability and consistency lenses required

for evaluating opinion evidence.

> [G]iven that "supportability . . . and consistency . . .
> are the most important factors [to] consider when []
> determin[ing] how persuasive [to] find a medical source's
> medical opinions . . . to be," 20 C.F.R. § 404.1520c(b)(2), we
> find that the ALJ's evaluation of these treating source
> opinions failed to adequately address a critical factor:  taken
> together, the opinions of [three treatment providers] are
> remarkably consistent in their evaluation of [the plaintiff's]
> mental state and ability to work . . . .  From three different
> treatment perspectives, each of these sources reached
> consistent conclusions regarding the degree of [the plaintiff's]
> impairment . . . .  Given that consistency of opinions is one of
> the most important factors to assess in this medical opinion
> analysis, the ALJ's failure to address, or even acknowledge in
> a meaningful way, these remarkably consistent opinions
> requires a remand when all of the consistent treating opinions
> are rejected in favor of the ALJ's own ad hoc and medically
> unsupported RFC determination.

Kenyon, 2021 WL 2015067, at *9; see also Bruce T. v. Kijakazi, Civ. No. 21-20289, at

*7 (D.N.J. Oct. 17, 2022) (citing Kenyon and remanding where ALJ rejected the treating

source consensus).

Like Judge Carlson, I conclude that the consistency of the opinions and the

examination notes of Plaintiff's treating physicians on the issue of Plaintiff's ability to

26

reach with her right (dominant) arm, requires remand where, as here, the ALJ rejected this evidence based on her interpretation of Plaintiff's activities of daily living.[21]

### 2.   Inconsistency between RFC and Hypothetical Question

Plaintiff also complains that the VE's testimony is flawed because the ALJ's hypothetical question to the VE did not match his RFC assessment.  Specifically, Plaintiff argues that a limitation to avoid "all exposure to hazardous machinery and unprotected heights," see tr. at 25 (RFC assessment in ALJ decision), would eliminate two of the three jobs identified by the VE because he was asked for jobs where the individual would need "to avoid all exposure to industrial machinery with moving, mechanical parts and unprotected heights." Id. at 91.

Because I have determined that the case must be remanded for further consideration of the medical evidence regarding Plaintiff's ability to reach with her right arm, which may alter the RFC assessment, I need not address this issue further.

## IV.   **CONCLUSION**

The ALJ's decision is not supported by substantial evidence.  As explained, the ALJ improperly rejected the consensus of medical opinion evidence regarding Plaintiff's

---

[21]I also note that it is not clear that the ALJ properly differentiated between the impairments and limitations of each of Plaintiff's shoulders/arms.  When she began her discussion, the ALJ stated that "[t]he record confirms diagnoses of incomplete tear of the left rotator cuff," citing Dr. Chertok's treatment notes from August 24, 2020.  Tr. at 26.  As previously mentioned, Dr. Chertok's notes conflate the left and right shoulders or refer to rotator cuff tears in both arms.  See, e.g., id. at 409, 442-44, 619.  It is clear however, reviewing the entire record, that the rotator cuff tear is in the right arm.  See id. at 495 (8/6/19 – ultrasound of right shoulder).

ability to reach with her right arm.  The case will be remanded for further consideration of the evidence relating to this limitation.

An appropriate Order follows.